500 P.2d 377 (1972)
TITAN CONSTRUCTION COMPANY, a Colorado corporation, Plaintiff in Error.
v.
James G. NOLF et al., Defendants in Error.
No. 71-249. (Supreme Court No. 24393.)
Colorado Court of Appeals, Div. I.
May 16, 1972.
Rehearing Denied June 6, 1972.
Certiorari Granted September 11, 1972.
*378 Zarlengo, Mott & Carlin, John C. Mott, Denver, for plaintiff in error.
Joseph J. Branney, John A. Criswell, Englewood, for defendants in error James G. Nolf and The Industrial Commission of Colorado.
Montgomery, Little & Freeland, Robert R. Montgomery, Denver, for defendant in error Phoenix Assur. Co. of New York.
C. Charles Buchler, Victor N. Nilsen, Englewood, for defendant in error Stephen Dach.
Selected for Official Publication.
COYTE, Judge.
This case was transferred from the Supreme Court pursuant to statute.
It arose out of an injury to James Nolf (referred to as Nolf), an employee of *379 Walt Flanagan & Co. (Flanagan), sustained when Nolf was unloading grout into a hopper at a construction site which was under the supervision of Titan Construction Co. (Titan). Nolf at the time of the accident was standing between the mixer truck and the pump being used to pump grout from a hopper onto the roof of the building being built by Titan. He was waiting for the pump to take enough grout out of the hopper so that he could replenish it with grout from his truck. The mixer on the truck was shut off and the pump motor, while apparently running, was not pumping at the time Nolf was injured. At this time the mixer truck was not completely empty. The injury was caused by a piece of falling cinderblock apparently jarred loose by a hose attached to the pump, which hose was used as a conduit to carry the grout onto the roof. This cinderblock might have come from masonry work performed by Stephen Dach (Dach) who was the masonry subcontractor for the project. At the time of the accident there was in effect an automobile liability policy issued by Phoenix Assurance Company of New York (Phoenix) to Walt Flanagan & Co. Benefits were paid to Nolf under the Workmen's Compensation Act for the injury, by Flanagan's compensation carrier.
Nolf and the Industrial Commission of Colorado brought suit against Titan. Titan filed a third-party complaint against Dach and Phoenix, alleging they were liable to Titan for indemnification. The trial court dismissed Phoenix from the case at the close of all the evidence. The jury found in favor of Dach on Titan's claim for indemnity and awarded Nolf $35,000 against Titan, who is now seeking reversal of all these judgments.

I.

LIABILITY OF TITAN TO NOLF
Titan argues that the jury was improperly instructed as to the obligation of Titan toward Nolf. The instruction in effect advised that Titan would be liable if it did not provide Nolf with a safe place to work. This instruction is in line with the recently announced opinion of Mile High Fence Co. v. Radovich, Colo., 489 P.2d 308.
There was no error in the giving of the instruction. The jury having determined that Titan was liable to Nolf under proper instruction, the judgment will not be disturbed.

II.

STEPHEN DACH IS NOT LIABLE TO TITAN ON EITHER A NEGLIGENCE THEORY OR AN INDEMNITY THEORY
Dach was a subcontractor who did the masonry work on the building being constructed by Titan. His workmen had been off the job for some three weeks prior to the happening of the accident and there was no direct evidence as to the source of the cinderblock that injured Nolf, or how it came to be placed on the wall. A rope used to guide the hose being used to carry the grout to the roof and the hose itself were scraping along the building; but who placed the cinderblock in the location from whence it fell was left entirely to speculation. There was no evidence to connect Dach with any negligent act relative to the loosening of the brick. The trial court was correct in directing a verdict in favor of Dach on the issue of negligence.
The second issue as to indemnification was submitted to the jury. The agreement between Dach and Titan provided that Dach would be responsible to Titan for:
". . . any and all liability, damages, losses, claims, and expenses, howsoever caused, resulting directly or indirectly from or connected with the performance of his agreement, irrespective of whether such liability, damages, losses, claims or expenses were actually or allegedly caused wholly or in part through the negligence of Contractor or any of its agents, employees or other Sub-Contractors."
*380 The jury was properly instructed that they could not impose liability upon Dach unless the injury complained of by Nolf "resulted directly or indirectly from or was connected with the performance of Dach's agreement under the terms of the sub-contract."
Any finding by the jury that the injury of Nolf resulted directly or indirectly from or was connected with performance of Stephen Dach's agreement under the terms of the contract would have been pure speculation and conjecture and could not have been allowed to stand. Accordingly, the finding of the jury in this regard will not be disturbed.
Titan also argues that the trial court erred in permitting the jury to determine whether the contract between Dach and Titan was entered into knowingly. Titan contends that this was not an issue in the case and that to instruct upon it was error. Since there was no evidence to support a finding against Dach even in the absence of the contract, any error in regard to instructing the jury on this issue was harmless error.

III.

LIABILITY OF PHOENIX ASSURANCE COMPANY OF NEW YORK
The trial court in dismissing the third-party complaint against Phoenix, held that Phoenix could not be liable under the circumstances herein presented because of an exclusionary clause in their policy. Because of such ruling, the court did not decide the questions as to whether the unloading had been completed and whether coverage extended to Titan under the loading and unloading provision of the policy.
The clause to which the trial court referred and upon which Phoenix relies is commonly referred to as "Employee Exclusion Clause" and reads as follows:
"This policy does not apply:
. . . . . .
"(b) Under Coverage A, to bodily injury to or sickness, disease, or death of any employee of the insured arising out of and in the course of (1) domestic employment by the insured, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law, or (2) other employment by the insured;
"(c) Under Coverage A, to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law."
This Employee Exclusion Clause must be read with another clause in the policy of Phoenix, namely the "Severability of Interests Clause" which reads as follows:
"8. Severability of Interests. The term `the insured' is used severally and not collectively, but the inclusion herein of more than one insured shall not operate to increase the limits of the company's liability."
If Nolf had been a stranger to both Flanagan and Titan at the time of the accident, and if his injuries had arisen out of the unloading of the cement truck, by the terms of the policy, Phoenix would have been liable whether suit was brought against Titan or Flanagan, or both.
If in this case, Nolf had brought suit against Flanagan instead of Titan, then Phoenix' policy would not apply because of the Employee Exclusion Clause. However, because Nolf was at the time of the accident the general employee of Flanagan (the named insured on Phoenix' policy), a question arises as to whether the aforementioned exclusion applies in his suit against Titan.
The weight of authority holds that, since Nolf (a general employee of the named insured, Flanagan) was not a general employee of Titan (an additional insured), the aforementioned exclusion does not operate, and primary coverage rests upon the policy of Phoenix. Although the reasoning of the various courts is not always the same, the results are uniform.
This court recently ruled on this question in a very similar factual situation. *381 Phoenix Assurance Co. v. Hartford Insurance Co., Colo.App., 488 P.2d 206. The court therein stated:
"Prior to 1955, the majority of cases held, although there was substantial opinion to the contrary, that the word `insured' meant any insured under the policy. See Annot., 50 A.L.R.2d 78 at p. 97. In 1955, to clarify the matter, a severability clause was added to the standard automobile insurance policy. The Hartford policy contains such a clause. It reads as follows:
`Severability of InterestsCoverages A and C: The term "the insured" is used severally and not collectively, but the inclusion herein of more than one insured shall not operate to increase the limits of the company's liability.'
"It is now generally recognized that the severability clause was added to limit the word `insured' in the employee exclusionary clause to mean only the particular person claiming coverage. See Liberty Mutual Insurance Co. v. Iowa National Mutual Insurance Co., 186 Neb. 115, 181 N.W.2d 247, and authorities cited therein.
"In addition, although there are decisions to the contrary, we find that the better-reasoned cases hold that the severability clause was added to restrict the meaning of the word `insured' to the particular person claiming coverage."
In accordance with our former ruling on the same matter, we hold that the Exclusionary Clause was not applicable and that Phoenix would be liable only if the act of unloading was a proximate cause of the accident and the resulting injuries to Nolf.
The Phoenix policy contained the following language material to the issue of whether the injuries arose out of the unloading of the truck:
"I. Coverage ABodily Injury Liability.

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of any automobile.
"II. Defense, Settlement, Supplementary Payments.

"With respect to such insurance as is afforded by this policy, the company shall:
"(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;
. . . . . .
"III. Definition of Insured.

"The unqualified word `insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. . . .
. . . . . .
"CONDITIONS
. . . . . .
"4. Purposes of Use Defined . . . (c) Use of an automobile includes the loading and unloading thereof."
The evidence is undisputed that the mixer truck was in the process of being unloaded at the time of the accident. The grout was being dumped from the cement truck to a hopper attached to a pickup owned by Titan. A pump was used to pump the grout from the hopper onto the roof of the building. The mixer truck was partially unloaded at the time of the accident. There was grout in the hopper at this time, and the 2-inch hose used to convey the grout from the pump was being moved along the side of the building. The *382 pump motor was running, but Nolf did not know whether it was actually pumping at the time. The final resting place of the cement was the roof of the building.
Our Supreme Court has never reached the question as to which unloading doctrine Colorado will follow. Northwestern Engineering Co. v. Rooks, 166 Colo. 297, 443 P.2d 977, concerned itself with unloading but in that case the court did not have to determine the question as to whether the operation was included within the unloading doctrine in that, as a question of fact, the trial court had decided that the unloading had not yet commenced. The court stated:
"The annotations and cases bring out three things:
(1) There are two doctrines, namely, the `coming to rest' doctrine and the `complete operation' doctrine;
(2) as is generally true in the construction and interpretation of insurance contracts, the intention of the parties to the contract is controlling; and
(3) that each case must be decided upon an ad hoc basis.
"Under the `coming to rest' doctrine, `unloading' comprises only the actual removing or lifting of the article from the loaded vehicle to the moment when it again comes to rest. The `complete operation' doctrine embraces the entire process involved in the movement of goods from the time they are given into the insured's possession until the insured has completed delivery thereof. See Annot., 95 A.L.R.2d 1129. Under either doctrine there must be some act on the part of a person other than the named insured, to cause commencement of coverage of such person. It is urged that coverage of Northwestern was in effect while the boom was being swung around because this was a preparatory step to unloading. If this be true, then coverage must have commenced at the time the crane ceased digging and detachment of the bucket was commenced; and, if then one of Northwestern's employees on the crane negligently operated it, causing injury or death to someone, Northwestern would be insured by Western Casualty with respect to the matter. We do not believe that this was the intent of the provisions of the policy."
It is our view of the case that, as a matter of law, the unloading was completed when the cement came to rest in the hopper. This was the final unloading place as far as Flanagan and his employee Nolf were concerned. The man who was running the pump, an employee of Titan, guided Nolf in the backing of his truck and told him when and were to move the truck.
After the concrete was dumped into the hopper, neither Flanagan nor any of his employees had any control over the same. The pickup pulling the hopper was owned by Titan, the man who was running the pump was employed by Titan, and the men on the roof who were controlling the hose from whence the cement was discharged were employed by Titan. In other words, the operation was completely under the direction and control of Titan from the time the cement was delivered into the hopper.
There is speculation as to who placed the cinderblock in such a position that it fell, but the evidence is clear that the cinderblock came from the wall or roof and was jarred loose by movement of the rope or the 2-inch line that was used to carry the grout from the hopper to the roof. There is no evidence nor any inference upon which one could even speculate that the delivery of the grout from the cement truck to the hopper had anything to do with the dislodging of the cinderblock.
Because of the undisputed facts Titan was an additional or omnibus insured under the Phoenix policy and, as such, entitled to all the protection afforded by the policy while the truck was in the process of unloading. However, it cannot have been within the contemplation of the parties that the coverage would be extended beyond placing the cement in the hopper. Accordingly, although the Phoenix policy *383 would cover Titan for any liability incurred by Titan arising out of the unloading of the truck, here, since there is no causal connection between the unloading and the injuries incurred by Nolf, Phoenix is not liable, and the judgment as to the dismissal of Phoenix is affirmed.
Judgment affirmed.
SILVERSTEIN, C. J., and ENOCH, J., concur.